**PRINCE HALL VILLAGE APARTMENTS,**
Appellee,

v.

**Judy BRADDY, Appellant.**

**No. 47158.**

Court of Appeals of Oklahoma,
Division 2.

April 8, 1975.

Released for Publication by Order of the
Court of Appeals May 8, 1975.

Prince Hall Village Apartments, pro se.

James H. Hiatt and Marilyn K. Staats, the Legal Aid Society of Oklahoma County, Inc., Oklahoma City, for appellant.

BRIGHTMIRE, Judge.

A "roach crawling across" a baby's face was the initiating incident eventuating in this ·forcible entry and detainer action against the infant's mother. Long before the action was to be heard the evictee demanded a jury trial. The special judge ruled she was entitled to none, proceeded to try the case himself most unfairly,[1] and ignoring relevant evidence entered a judgment ousting defendant from the apartment and adjudging her indebted for $300.-50 back rent, $35.00 attorney fees, and $22.00 costs. Reversal is sought on three grounds: (1) defendant had a statutory right to a jury trial; (2) the judgment is contrary to the evidence; (3) incompetent evidence was prejudicially received and given controlling consideration by the court. We agree and reverse.

Despite the trial judge's obvious prejudice against and hostility toward defendant disclosed by the record, she did manage to

---

1. For example at one point the judge came on with one of his frequent interruptions and asked the 24-year-old defendant these irrelevant questions:

"Do you collect—you live off the relief of the government?

"Not anymore," answered the woman.

"What do you mean, not anymore," badgered the court, "when did you stop?

. . . . .

"May I object," asked her lawyer.

"You can object. I won't pay any attention to you," the judge throated, "I am interested in this. Why not anymore?

"Because my case was terminated.

"When?

"It was effective 1–12–73.

. . . . .

"Why was it terminated?

"Unable to approve eligibility.

"You had a husband?" pressed the judge.

"Yes," the witness said.

The immaterial interrogation continued on for about three more pages in the record. Finally the court asked defense counsel:

"Do you have any questions now?

"Yes, Your Honor.

"All right.

"May I first inquire of the Court why the Court saw fit to go into the welfare status of this lady?" asked the lawyer.

"That is what this is," responded the judge.

"This is not a welfare hearing . . . ." the lawyer explained.

Said the court: "Everything that this matter pertains to, this Court has jurisdiction in, everything. You may ask Mr. Alexander there. I have jurisdiction in everything that pertains to people. That is right, isn't it, Mr. Alexander?"

Mr. Alexander, who is not otherwise identified in the . record, contritely answered, "That is correct, Your Honor"!

Later when defense council was trying to make a relevant point about the lady having to accept the apartment sight unseen (a fact the manager did not deny) to show why she did not know about the repair needs of the apartment before she moved in, the judge cut him off saying, "She wasn't required to do that. Let's get down to what this lawsuit is about. That is the reason I didn't want a jury, that was the reason. Now the point is, lady—. . . I don't know if I could be your guardian or not. I doubt it . . ."

Still later the judge suggested contrary to the evidence that the presence of roaches in defendant's apartment was because she did not keep the place clean.

Finally after both parties rested defendant's counsel made a second motion for a mistrial.

"I ain't going to grant it,'" ruled the judge, and then departing from his judicial function and usurping the state welfare director's office, continued, "We have got enough expense here to start with. We have got Legal Aid, we have got housing, we have got relief, we have got everything free and I am not going to grant—carry on this way. I like to take care of people too but there is a limit of taking care of everyone."

Perhaps the trial judge overlooked the fact that "the justice of a society is not measured by how it treats its richest men but how it treats its poorest."

get into evidence facts supporting her defense—that she was never delinquent in her rent.

She rented the apartment in question in May 1973 under a written "Lease Agreement"—a document concerning which plaintiff's manager testified but never offered in evidence. Along with the rental she agreed to pay fifty cents extra each month for "pest control"—thus imposing upon plaintiff a contractual duty to furnish defendant apartment with adequate pest control.

Upon moving in defendant examined the apartment in some detail, made a list of several things in need of repair and gave it to the manager who said he would send someone up to check on them. These repairs were never made.

Nor did the manager cause the apartment to be sprayed for pest control within three months (by August 18) as he was supposed to. Consequently defendant was awakened by her crying baby at 3:00 o'clock on the morning of September 1. She checked the wee one and found "a roach crawling across her face." She testified, "I snapped her up and also noticed that the other two children had roaches crawling across them too, so after I quieted them back down I went to the icebox to get some milk for the baby to put her back to sleep. When I opened the icebox the roaches were all inside of there."

To eliminate this unhealthy condition defendant called an exterminator later that morning and paid him $8.50 to spray the place.

When defendant went to pay the September rent a couple of days later she tendered the amount of rent due less the $8.50. The manager refused the tender saying he would not accept partial payment.

The next month defendant tendered the full October rent on time and it too the manager refused because she had not offered to pay "the rest of the money for September." Same thing happened November 1. Defendant, who had been told to move, started looking for another place in November but had not found one by time of trial.

This action was commenced November 26, 1973, and set for trial December 12. On that day defendant appeared and demanded a jury trial. Trial was passed to December 17 on which day the judge denied defendant a jury trial saying, "I see no jury question in here notwithstanding your theory of the statute which I don't agree with." The statute the judge was referring to evidently was 12 O.S.1971 § 1148.1, et seq. Presumably he could not imply affirmatively the entitlement of a party to a jury trial from the negative language of § 1148.7 of the "Forcible Entry and Detainer" act entitled "Jury trial-Trial by court":

"If neither party demands a jury trial on or before the day of trial, the court shall try the cause."

But the clear import of this language is that if either party demands a jury trial the court is obliged to empanel a jury.

In order to bolster his first excuse for dispensing with a jury the judge came up with a second statutory misconstruction saying defendant was not entitled to a jury "unless there is some pleading filed and some question of fact raised. There is none here." All this, mind you, takes place right after the case is called for trial on December 17, 1973. Such edict ran exactly counter to the express words of § 1148.6 specifying that, "No answer by the defendant shall be necessary . . ." unless "defendant wishes to assert title to the land or . . . the boundaries of the land are in dispute . . . ." —exceptions neither of which is involved here.

There can be no doubt that defendant had an absolute right to a jury trial at the time she demanded it and, even if her evidence had presented no legal defense, refusal to grant it was an arbitrary and incredibly arrogant reversible error. Jackson v. General Finance Corp., 208 Okl. 44, 253 P.2d 166 (1953). But we think she did

present a defense—one that stood uncontradicted. As we mentioned earlier in spite of her judicial difficulties defendant did manage to get evidence in that she was never delinquent in her rent—a defense the trial judge acknowledged being aware of before the trial commenced. So before trial there were two potential questions of fact for determination: (1) Was defendant delinquent in her rent? (2) Was proper notice to quit served on defendant?[2]

As will be explained the first question disappeared into undisputed facts the consequences of which became a matter of law for the court to determine; and the second issue never became the subject of sufficient evidence to authorize an adjudication in favor of plaintiff.

In regard to the first point the plaintiff's manager confirmed defendant's testimony that plaintiff collected fifty cents a month from each tenant to pay for roach and other pest control. This witness, the only one plaintiff put on, other than to call defendant as an adverse witness, testified on the issue of whether defendant paid her September rent saying "I don't collect that money. I have a secretary in the office, I seldom do."

As to whether defendant offered the rent payment less the $8.50 pest control expense the manager said, "Well, I will tell you one thing . . . she may have offered partial payment which we do not accept. . . . If it was turned down I am sure she did because the secretary would not have taken it."

Thus the testimony of defendant that she tendered to plaintiff the September rent less the amount of the pest control bill as well as the full amount of the rent due on October 1 and November 1 stands undisputed.

■ The main remaining question then is whether defendant had a right to withhold the extermination invoice?

In this regard plaintiff, during the trial, stipulated to the $8.50 bill received by defendant from Triple A Exterminators, adding, "We will also stipulate Prince Hall Village Apartments will be responsible for whatever amount it is and give her credit for it." This resulted in there being no dispute about the justification for defendant's incurring the pest control expense which brings us face-to-face with the issue of whether she could legally withhold the bill from the rent? We hold she could.

This conclusion comports with the policy of this state regarding the rights of a lessee in the event a lessor breaches a duty to keep leased building in "a condition fit for human occupation,"[3] and if after notice of the building being in a harmful state the lessor fails to correct it then, among other things, the lessee may rectify the situation and deduct the expense thereof from the rent.[4]

Even if it be argued that a strict construction of 41 O.S.1971 §§ 31 & 32 might restrict the terms "dilapidations" and "repairs" to structural defects in the building, we still have a situation here where the lessor by agreement took on the duty to prevent vermin infestation of the apartment for a fee a breach of which duty is

2. This second question, among other things, is related to the term of the written lease which remains unknown to us because the lease was never admitted into evidence.

3. 41 O.S.1971 § 31:

"The lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, except that the lessee must repair all

deteriorations or injuries thereto occasioned by his ordinary negligence."

4. 41 O.S.1971 § 32:

"If within a reasonable time after notice to the lessor of dilapidations which he ought to repair, he neglects to do so, the lessee may repair the same himself, and deduct the expense of such repairs from the rent, or otherwise recover it from the lessor; or the lessee may vacate the premises, in which case he shall be discharged from further payment of rent, or performance of other conditions."

so closely akin to repairs as to warrant the invocation of the same remedial public policy. We therefore hold defendant had the right, under the circumstances of this case, to deduct the extermination bill from the rent and therefore her tenders of rent in September, October and November were valid legal ones which plaintiff's manager wrongfully refused.

 While such unjustified refusal does not operate to satisfy the debt, it does discharge the debtor from liability for interest accruing subsequent to the tender and for costs incurred in a lawsuit seeking to reduce the debt to judgment. Smith v. Owens, Okl., 397 P.2d 673 (1963).

Accordingly we hold that because defendant was unlawfully denied a jury trial and because the judgment entered in this case is not supported by sufficient evidence it is reversed and the case remanded for a new trial.

NEPTUNE, P. J., and BACON, J., concur.